THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIEZER CRUZADO, Defendant-Appellant.

First District (5th Division)   No. 1—97—1418

Opinion filed September 4, 1998.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

Following a jury trial, defendant Eliezer Cruzado[1] was found guilty of first-degree murder and sentenced to a 28-year prison term. He appeals, raising as issues whether he was denied his right to a fair trial where (1) he was precluded from presenting witnesses; (2) the circuit court prohibited him from presenting evidence of his mental capacity to support his claim of self-defense; (3) the State failed to disclose to him a prior conviction of a witness until after trial; and (4) the State presented testimony of a gang expert.

On September 17, 1993, 17-year-old Avilio Lopez died from a gunshot wound to the abdomen. Several weeks later, the 15-year-old defendant was questioned at the police station, where he gave a statement admitting that he shot Lopez. Prior to trial, defendant's motions to quash his arrest and suppress his statement were denied.

At a hearing on defendant's second amended motion to suppress his statement, Assistant State's Attorney (ASA) Howard Weisman testified that he advised defendant of his *Miranda* rights and interviewed him in the presence of youth officer Donald O'Neill and Detective Reynaldo Guevara. Defendant agreed to have his statement recorded by a court reporter, a transcript of which he read, corrected, and signed. Defendant was responsive to questions and informed ASA Weisman that he could read and write. No threats or false promises were made to defendant in exchange for his confession, nor was he confused, scared, or worn down. Detective Guevara's testimony was substantially similar to that given by ASA Weisman.

Defendant's mother also testified at that hearing but stated that defendant could not read or write, take public transportation due to his inability to recall the route numbers, or write his own name. She admitted that she had no problems conversing with her son and that one of his problems with school was his absenteeism.

Defendant testified that recently he read a third-grade book and that his reading ability was better at the time of giving testimony than in October 1993. On the night of the arrest, no one advised him of his *Miranda* rights. Further, he was told that he would be able to see his family again if he agreed to make a statement. Defendant was afraid because Detective Guevara informed him that he would spend the rest of his life in jail unless he did what he was told. He recognized

---

[1] Both parties refer to defendant in their briefs as "Elizer" Cruzado. At the hearing on the motion to suppress defendant's statement, testimony from the assistant State's Attorney who took the statement revealed that defendant altered the spelling of his name on his signed confession from "Elizer" to "Eliezer"; therefore, we will employ the latter spelling.

his name on each page of the confession and admitted signing each page. He denied reading the statement out loud at the police station because he could "hardly read," but admitted reading it to himself, comprehending only some of the words. He understood only half of what ASA Weisman said to him.

Ruling that defendant was advised of and comprehended his *Miranda* rights, the circuit court found that he was "streetwise" and that there was no evidence to suggest that he did not understand the situation in which he found himself. Defendant had received advice of his *Miranda* rights upon his three previous arrests, indicating that he was well aware of his predicament. The court recognized the testimony of Dr. Diane K. Strufe, a psychologist employed by the Department of Corrections, establishing that the evaluations by other doctors essentially were useless because there was no hard data or evidence in any report prepared by them to substantiate their conclusions. The case proceeded to trial.

The following trial evidence was adduced. Lopez's friend, Javier Claudio, testified that he and Lopez were walking toward Duk's restaurant at Fullerton and Kimball on September 17, 1993, at 11:30 p.m. One-half block away from the restaurant, they encountered a group of Imperial Gangsters. Claudio flashed the group the sign of his gang, Orchestra Albany. At Duk's, they saw an individual nicknamed "Roach," who was a member of the Imperial Gangsters, although formerly an Orchestra Albany gang member. As Claudio and Lopez continued walking through the restaurant's parking lot, Roach made a comment to Lopez and then punched him in the face. A fistfight ensued near the door of the restaurant. Claudio heard a 12- or 13-year-old individual scream "get the gun." With a gun in his right hand someone, later identified as defendant, exited Duk's and shot twice at Lopez, who then fell to the ground holding his stomach.

Diane Shalla and Tomika Vallo, both employed as waitresses at Duk's, arrived together to begin their shift. They noticed the fight, heard two gunshots, and turned to see defendant standing in the doorway of Duk's holding a gun and pointing it at Lopez. Clutching his stomach, Lopez fell to the ground. When Lopez was shot, he had nothing in his hands, his arms were at his sides, and he did not advance toward defendant. The women then saw defendant flee from the parking lot in a car.

An autopsy revealed that the bullet entered on the left side of Lopez's abdomen, perforated his small intestine, contused his large bowel and colon, went through a major blood vessel, and lodged in his sacroiliac. In the medical examiner's opinion, the shooter had to be more than two feet away from Lopez, there being no evidence of close-range firing.

Two or three days later, Claudio identified defendant from photographs as the shooter. A few weeks later, Shalla and Vallo identified defendant in a police lineup as Lopez's killer.

Gang crimes specialist Officer George Figueroa testified that during his 15 years in this job, his duties included interacting with the Imperial Gangsters gang to identify members and its hierarchy. In September 1993, the Imperial Gangsters and Orchestra Albany gangs were aligned under the faction labeled "Folks" but were experiencing friction due to disagreements over territory and narcotics sales. Some aspects of gang culture he revealed included: the gang is made up of leaders and soldiers; soldiers are required to take orders from leaders; "violations" occur, ranging from suspension to death, if a member loses drugs, informs police, or does not aid another member; and behavior is encouraged that enhances a gang's reputation, such as killing a rival gang member.

At the close of the State's case, defendant's motion for a mistrial based upon the admission of evidence pertaining to gang affiliation was denied. Defendant's motion to have this evidence stricken was denied as well.

Defendant then testified in his own defense. On the evening of September 17, 1993, he was looking for his sister who, he learned, might be at Duk's. On his way there, he encountered fellow gang member Miguel Cruz, who handed him a gun with instructions to give it to "Flip," the Imperial Gangsters chief. He took the gun in order to avoid the "violation" of being beaten up by the gang.

Entering Duk's, defendant, from inside the restaurant, observed Roach and Lopez fighting. Defendant later went outside "to see what was going on." He was not required to aid Roach. Roach fell to the ground and Lopez turned and began walking toward defendant. Lopez was "reaching in his back and in his pocket." Fearing that Lopez had a gun or a knife, defendant pulled the gun out of his pocket, waited 30 seconds, but Lopez kept walking in his direction so defendant fired the gun.

Defendant knew of Lopez's reputation for violence: one year before this incident, defendant watched Lopez punch and kick a man, in the face, who declined to buy Lopez a beer.

The jury found defendant guilty. Defendant's posttrial motions and new trial motion were denied and he was sentenced to 28 years' imprisonment.

## I

Defendant first contends that he was denied his right to a fair trial because he was precluded from presenting evidence of Lopez's violent behavior to support his claim of self-defense.

■ The admission of evidence is within the sound discretion of the circuit court and will be upheld absent a clear showing of abuse of discretion and manifest prejudice. *People v. Lucas*, 151 Ill. 2d 461, 489, 603 N.E.2d 460 (1992) (*Lucas*); *People v. Galvan*, 244 Ill. App. 3d 298, 302-03, 614 N.E.2d 391 (1993) (*Galvan*). When self-defense is raised, testimony concerning the victim's reputation and character may be offered for two distinct purposes. *People v. Lynch*, 104 Ill. 2d 194, 200, 470 N.E.2d 1018 (1984) (*Lynch*); *People v. Hanson*, 138 Ill. App. 3d 530, 537, 485 N.E.2d 1144 (1985) (*Hanson*); *People v. Buchanan*, 91 Ill. App. 3d 13, 16, 414 N.E.2d 280 (1980).

> "One purpose of the testimony may be to show the reasonableness of the defendant's state of mind in acting in self-defense; a second purpose may be to support the defendant's testimony that the deceased was the aggressor. [Citation.] These distinct purposes serve different functions and carry different requirements as to the defendant's knowledge of the deceased's character and reputation." *Buchanan*, 91 Ill. App. 3d at 16.

If the testimony is offered to show defendant's state of mind, defendant must have known the information about the victim when the alleged self-defense occurred; if the testimony is offered as evidence of the victim's violent nature to establish that the victim was the aggressor, defendant is not required to possess knowledge of the victim's reputation. *People v. Ware*, 180 Ill. App. 3d 921, 927, 536 N.E.2d 713 (1988); *Buchanan*, 91 Ill. App. 3d at 16.

In the instant case, Lopez had two prior arrests. His first arrest was in November 1992, for creating a public disturbance. This led to a protective pat-down search which ultimately revealed a gun and resulted in Lopez also being charged with misdemeanor unlawful possession of a firearm. He also was arrested in September 1993, for disorderly conduct for yelling and displaying gang signs. Defendant attempted to elicit testimony from police officers that they had observed Lopez "commit acts of unlawful use of weapons, flashing gang slogans, disorderly conduct and gang action," which was denied by the circuit court. Notwithstanding his own testimony regarding his knowledge of Lopez's past violent behavior, defendant claims that had the jury heard about Lopez's reputation for violence, the outcome of the trial would have been different. The pertinent inquiry is whether the information that surrounded Lopez's arrests was indicative of his violent nature, thereby supporting admission of those arrests into evidence.

Defendant cites several cases which all stand for the proposition that the circuit court improperly excluded evidence of violent behavior on the part of the victim where the defendants claimed self-defense. See, *e.g., People v. Booker*, 274 Ill. App. 3d 168, 653 N.E.2d 952 (1995);

*Hanson*, 138 Ill. App. 3d 530; *People v. Gossett*, 115 Ill. App. 3d 655, 451 N.E.2d 280 (1983). The State does not dispute that evidence of violent behavior may be admissible to show that Lopez was the aggressor, but argues that the evidence here was not probative of a violent nature.

■ Lopez' first arrest resulted from his creating a public disturbance by yelling and, upon a protective pat down, a handgun was found in his possession. A charge for unlawful possession of a firearm does not show a propensity for violence. *People v. Costillo*, 240 Ill. App. 3d 72, 82, 608 N.E.2d 100 (1992). See *People v. Ellis*, 187 Ill. App. 3d 295, 301, 543 N.E.2d 196 (1989). Additionally, there is no evidence as to what Lopez was doing other than yelling, which by itself is no indication of violent behavior. See *People v. Huddleston*, 176 Ill. App. 3d 18, 28, 530 N.E.2d 1015 (1988).

The second arrest was for disorderly conduct as a result of Lopez gesturing gang signs, shouting gang slogans, and displaying gang colors. There is no evidence showing that this activity constituted violent behavior by Lopez. An arrest for disorderly conduct does not by itself establish a violent nature. *People v. Baer*, 35 Ill. App. 3d 391, 396, 342 N.E.2d 177 (1976). Because this evidence does not tend to show that Lopez had a violent nature, it had no probative value in determining who the aggressor was in the altercation.[2] *People v. Lovelace*, 251 Ill. App. 3d 607, 622, 622 N.E.2d 859 (1993).

For the foregoing reasons, the circuit court did not abuse its discretion in debarring evidence of Lopez's alleged violent behavior.

## II

Defendant next asserts that he was denied a fair trial because he was not permitted to present medical evidence of his limited intellectual ability as relevant to his intent and reasonable belief in using self-defense.

■ The admission of evidence rests within the discretion of the circuit court; its decision will not be reversed unless such discretion has been abused resulting in manifest prejudice to defendant. *Lucas*, 151 Ill. 2d at 489; *Galvan*, 244 Ill. App. 3d at 302-03.

Defendant maintains that the medical evidence demonstrates he had a history suggestive of attention hyperactive disorder, tested below third-grade level, identified letters and not words, had limited cogni-

---

[2] Contrary to defendant's argument, the circuit court did not rely on *People v. Huddleston*, 176 Ill. App. 3d 18, 530 N.E.2d 1015 (1988), to exclude the information surrounding the victim's arrests, but found that the circumstances of defendant's arrests were not of the violent nature contemplated by the *Lynch* court.

tive ability with possible coexisting brain damage, and was borderline mentally retarded. Defendant attempted to present the opinions of Dr. Albert Stipes and Dr. Diane Strufe to support his claimed intellectual infirmities. To determine whether the circuit court abused its discretion in precluding this evidence, a review of the doctors' proffered opinions is necessary.

Dr. Stipes reported the results of his evaluation of defendant to the circuit court via a letter. This evaluation was undertaken in anticipation of a pretrial hearing to determine whether defendant was capable of understanding his rights under *Miranda*. Dr. Stipes wrote that defendant showed no evidence of psychosis, mood disorder, nor any significant intellectual deficit, but that defendant had a history of a learning disability and possessed borderline intellectual function. Dr. Stipes was of the further opinion that "there is no evidence of any mental disease or defect which would have rendered him unable to form any intent at the time of the offense."

Dr. Strufe also evaluated defendant and subsequently testified at the motion to suppress regarding her findings. Her own evaluation revealed that defendant had a borderline IQ of 71. His major problem in school was that he did not attend or, when he did attend, he did not pay attention. His absenteeism, lack of attention, and bad attitude all contributed to his reading and spelling being below the third-grade level.

Dr. Strufe conducted her own tests to determine the intellectual capability of defendant and also examined any reports and evaluations contained in his record. Only two evaluations existed: Dr. Daniel Shift's psychiatric evaluation, based only upon one interview; and Dr. Asher Levy's psychological evaluation. Dr. Strufe found nothing in Dr. Shift's interview that she could use in making her determination. Additionally, although Dr. Shift indicated that defendant suffered from attention deficit disorder, Dr. Strufe found no indications of this disorder and there was nothing in this doctor's report to support his mere conclusion. Dr. Levy's evaluation noted that defendant showed indications of organic brain damage; however, Dr. Strufe testified that no neuropsychological tests existed to substantiate such a finding. Finally, no test scores were reported in defendant's records to indicate any limited cognitive abilities.

■ Neither Dr. Stipes' nor Dr. Strufe's testimony supports defendant's claim of attention hyperactive disorder, brain damage, or borderline mental retardation. Dr. Strufe's testimony illustrated that the claim of attention deficit disorder was nothing more than an unsubstantiated notation in defendant's records, as was the notation of brain damage. Because defendant did not intend to present Drs.

Shift and Levy to explain their evaluations, nothing existed beyond their written reports and unsupported notations to reveal the evidentiary bases for their findings.

Similarly, defendant's claim of mental retardation also had no basis in fact; no one testified that he was mentally retarded. Further, rather than support defendant's argument, Dr. Stipes specifically stated that defendant had no significant intellectual deficit or mental defects despite his learning disability and borderline IQ. Without any evidentiary bases to support defendant's claims of limited intellectual ability, the unsubstantiated notations in his medical record and statements by his counsel were nothing more than suggestions and, therefore, were properly excluded as not relevant.

Lastly, defendant claims that evidence of his below third-grade reading level should have been admitted as well. This information may have been relevant to whether he waived his *Miranda* rights; however, defendant did not demonstrate how a low reading level relates to his state of mind for a claim of self-defense.

For the foregoing reasons, defendant's insistence that the circuit court abused its discretion in forestalling evidence of his limited intellectual capacity fails.

### III

Defendant also contends that he was denied a fair trial because the State failed to disclose a criminal conviction of one of its witnesses, Tomika Vallo.

■■ The prosecution is required to disclose to the defense evidence that is material to defendant's guilt or innocence. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963) (*Brady*); *People v. Sims*, 167 Ill. 2d 483, 507, 658 N.E.2d 413 (1995) (*Sims*). This requirement has been codified in Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)) and includes the disclosure of prior criminal convictions of individuals the State intends to call as witnesses at trial. Nevertheless, failing to comply with these discovery requirements does not always require a new trial. *People v. Harris*, 123 Ill. 2d 113, 151, 526 N.E.2d 335 (1988). To be determined is whether the undisclosed evidence was material, *e.g.*, "when it would tend to raise a reasonable doubt of the defendant's guilt." *Sims*, 167 Ill. 2d at 507. The appropriate inquiry "is not whether the evidence might have helped the defense, but whether it is reasonably likely that it would have affected the outcome of the case." *Sims*, 167 Ill. 2d at 507. Applying these principles to defendant's contentions, the State's discovery violations did not pertain to material evidence that would have affected the outcome of the trial and, therefore, did not prejudice defendant.

Absent evidence of Vallo's conviction, defendant argues that the jury was unable to weigh the credibility of the witnesses. The State acknowledges that it failed to disclose Vallo's prior conviction, but argues that her testimony was cumulative and, therefore, no prejudice resulted. Claudio, Shalla, and Vallo testified on behalf of the State. The State maintains that even if Vallo had been impeached with her prior conviction, the jury heard substantially similar testimony from the two other witnesses. A review of the testimony, previously set forth in this order, reveals that their testimony is so similar to each other's, and so different from defendant's recount of the events, that evidence of Vallo's conviction would not have affected the outcome in this case. Only defendant's account of the events differs significantly from the State's witnesses. Contrary to defendant's testimony, all three State's witnesses stated that Lopez had nothing in his hands and did not walk toward defendant. Further, Shalla and Vallo maintained that Lopez's arms were at his sides and Claudio testified that his fists were in front of him; none of them testified that Lopez was reaching behind his back, as defendant asserted.

The substantially similar testimony of these three witnesses constitutes overwhelming evidence against defendant. Consequently, evidence of Vallo's conviction was not material because it would not have tended to raise a reasonable doubt of defendant's guilt. Moreover, Claudio's tainted character was introduced. His prior conviction, as well as his gang affiliation, was exposed; yet, the jury still found defendant guilty. In light of the foregoing, it is not reasonably likely that Vallo's conviction would have affected the outcome of the case.

Significantly, the circuit court found that the State's failure to disclose the *Brady* material was not deliberate. Although this omission may not be condoned, there is nothing in the record to contradict the court's determination. Even defense counsel observed that he did not believe the prosecutor was aware of the conviction.

For the foregoing reasons, defendant was not denied a fair trial despite the State's failure to disclose a witness' prior conviction.

## IV

Defendant lastly argues that the circuit court abused its discretion by permitting gang expert, Officer Figueroa, to testify.

■ In order to preserve an issue for appeal, a party must have moved *in limine* or objected at trial and raised the issue in a post-trial motion. *People v. Hudson*, 157 Ill. 2d 401, 434-35, 626 N.E.2d 161 (1993); *People v. Boclair*, 129 Ill. 2d 458, 476, 544 N.E.2d 715 (1989). Defendant did argue a motion *in limine* to bar evidence of defendant's gang membership; this issue has not been waived, as the State contends.

On the merits, defendant argues that Officer Figueroa's testimony detailing some aspects of gangs should have been precluded because it was not necessary to aid the jury in understanding Claudio's testimony. Further, he claims that the evidence was not relevant because there was no connection between defendant's motive and the officer's testimony. He also insists that any probative value of the gang-related evidence was outweighed by its prejudicial effect. The State responds that Officer Figueroa's testimony was necessary to explain defendant's motive in leaving the safety of the restaurant and shooting Lopez when defendant ostensibly was not involved in the fight.

■ Police testimony "regarding gang activity is proper when [(1)] the officer's testimony qualifies as expert opinion, [(2)] the testimony is relevant, and [(3)] the prejudicial effect of the opinion does not outweigh its probative value." *People v. Langford*, 234 Ill. App. 3d 855, 858, 602 N.E.2d 99 (1992).

■ With respect to the first element, defendant does not take issue with the officer's knowledge of or experience with gangs, but complains that his testimony did not aid the jury because it was not beyond the understanding of an ordinary person. Officer Figueroa explained that gang members must be loyal and are expected to come to the aid of a fellow gang member. Defendant's gang is comprised of leaders and soldiers; the soldiers take orders from the leaders. "Violations," such as not coming to the aid of another gang member, result in punishment ranging from suspension to death. Further, behavior such as killing a rival gang member or enhancing the gang's reputation is encouraged.

There has been no showing that the average layperson has any understanding of the inner workings of gangs as set forth above, or of the jury's common knowledge of them. Officer Figueroa's opinion was helpful to the fact finders, thereby qualifying his testimony as "expert."

Next, Officer Figueroa's testimony was highly relevant in explaining defendant's motive for shooting Lopez. Relevant evidence is that which tends to prove or disprove a disputed fact or render the matter in issue more or less probable. *People v. Mason*, 274 Ill. App. 3d 715, 722, 653 N.E.2d 1371 (1995) (*Mason*). The gang-related evidence tended to render defendant's claim of self-defense less probable and establish that defendant had a reason to shoot Lopez without acting in self-defense.

Despite defendant's contention otherwise, there was a connection between defendant's motive for shooting Lopez and the evidence of gang structure, clothing, beliefs and habits; Officer Figueroa's testimony tended to show that the shooting was gang motivated. He

stated that at the time of the shooting, there was friction between the normally aligned Imperial Gangsters and Orchestra Albany due to disputes over territory and narcotics sales. This explained why Roach and Lopez were fighting in the first place and why defendant involved himself in the altercation. The gang structure shows why defendant had a gun in his pocket. The loyalty among gang members, the encouragement of behavior such as killing a rival gang member, and the "violations" that occur if a member does not aid another all demonstrate why defendant would leave the safety of the restaurant and shoot Lopez, not Roach. Absent this background information, the jury would be unable to mesh the State's theory of the case with anything beyond mere supposition. Because Officer Figueroa's testimony tended to disprove self-defense and show motive, it was relevant and properly admitted.[3]

As to the third element, the gang-related evidence was not more prejudicial than probative. Courts acknowledge that a strong prejudice against street gangs may exist, particularly in metropolitan areas. *People v. Patterson*, 154 Ill. 2d 414, 458, 610 N.E.2d 16 (1992). Evidence of gang affiliation, gang history, and gang structure is generally admissible nevertheless, although it may prejudice defendant, if it is relevant to the crime. *People v. Fort*, 248 Ill. App. 3d 301, 315, 618 N.E.2d 445 (1993). Such evidence may be received to provide motive for an otherwise inexplicable act. *Fort*, 248 Ill. App. 3d at 315.

Because the gang-related evidence was relevant to establish motive and others were shown to be gang members, Officer Figueroa's testimony was more probative than prejudicial.

Finally, defendant's assertion that the case *sub judice* is similar to *Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371, is misplaced. The State's theory in *Mason* was that defendant and the victim were members of the same gang and, therefore, evidence of defendant's affiliation with the gang and its organizational structure was relevant to demonstrate his possible motive for shooting the victim. *Mason*, 274 Ill. App. 3d at 722. The *Mason* court found that facts about gang rivalries, presentment, graffiti, tattoos, and drug sales were irrelevant and prejudicial to the State's theory of the case. *Mason*, 274 Ill. App. 3d at 722.

Unlike the defendant in *Mason*, defendant and Lopez were not

---

[3] The officer's testimony pertaining to gang clothing may be the only questionably relevant evidence. An examination of the record, however, reveals that defense counsel elicited testimony regarding gang clothing from Claudio before the State garnered such information from Officer Figueroa. In light of this fact, the admission of the officer's knowledge of gang attire merely affirmed Claudio's statement.

members of the same gang; however, defendant and Roach, who was involved in a physical altercation with Lopez, were both Imperial Gangsters. The rivalry between defendant's gang and Lopez's gang, coupled with defendant's loyalty to Roach, make the gang-related information relevant to the State's theory of the case. Because this evidence is crucial in establishing motive, it is more probative than prejudicial.

Defendant's arguments to the contrary, the circuit court did not abuse its discretion in admitting Officer Figueroa's testimony about gang culture.

For the foregoing reasons, defendant's conviction and sentence cannot be disturbed and, therefore, must be affirmed.

Affirmed.

HOURIHANE, P.J., and HOFFMAN, J., concur.