THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERROLD DAVIS, Defendant-Appellant.

First District (3rd Division)   No. 1—00—3916

Opinion filed November 6, 2002.

Anita Rivkin-Carothers, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Theodore Fotios Burtzos, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

In the early morning hours of July 7, 1998, Larion Jackson, his brother Chris, and some friends were on a porch outside the Jackson home at 512 North Laramie Street in Chicago. Two men approached the porch, one carrying a handgun, the other a shotgun. The men fired their weapons, then turned and ran.

One of the shots struck Larion. He died of a gunshot wound to the head. The police investigation eventually led to Derrold Davis. He was arrested on August 10, 1998. During the next 36 hours he admitted, orally and in writing, that he drove the car that carried the shooters to the scene of the shooting and then drove them away after the shots were fired.

After a jury trial, Derrold was convicted of the first-degree murder of Larion, the attempted first-degree murder of Chris, and aggravated discharge of a firearm. He was sentenced to 25 years, 10 years, and 10 years, respectively, sentences to be served concurrently. He now appeals those convictions.

His contentions include challenges to the legality of his arrest, the voluntariness of his confessions, the admission of testimony and opinions about gangs, and the propriety of certain closing argument remarks made by the State.

We affirm the convictions and sentences.

## FACTS

### PROBABLE CAUSE HEARING

Derrold filed a motion to quash his arrest and suppress his statements on the ground that the police lacked probable cause to arrest him. At the hearing, Derrold testified he went to the police station in the early morning hours of August 10, 1998, to complain about an unrelated shooting. Ronald Chatman, Derrold's cousin, corroborated this portion of Derrold's testimony.

Derrold was placed in the lockup and questioned about the unrelated shooting. The police then questioned him about the shooting of Larion Jackson. Derrold made an oral statement, then a signed handwritten statement, incriminating himself in the Jackson shooting.

Detective James Gilger of the Chicago police department testified that on July 9, 1998, he was assigned to investigate Larion's murder and the attempted murder of Chris Jackson. That day, he went to the area of the shooting to canvass the neighborhood for witnesses.

At about 7 p.m. he found Jemar Williams, a member of the Traveling Vice Lords gang. Williams was not a regular informant, but Gilger had used Williams before for information. When Williams told Gilger he knew about the murder, Gilger took Williams to the police station to be interviewed. Williams was not a suspect.

Williams told Gilger he was sitting on his front porch when he heard a couple of gunshots. He looked over to where the noise came from and saw a Black P-Stone gang member whose nickname is Twin shooting at people on the porch at 512 North Laramie with a handgun. Williams was not sure whether the handgun was a .45-caliber or a .9-millimeter gun, but he knew it was a black steel handgun.

He also saw another person firing a shotgun at the people on the porch. Gilger said Williams gave him a description of the shotgun shooter.

Williams saw the people on the porch scrambling. He saw one of the people "go down *** so [Williams] knew he got shot." A white car then pulled up, and the two shooters got in the car. The car drove away. Williams said the driver of the car was the twin brother of the shooter nicknamed Twin.

Gilger was familiar with the twins. They were Jerrold and Derrold Davis. Gilger also knew Jerrold went by the nickname Twin. Gilger thought Derrold went by the nickname Twin Two or Twin Number Two.

Jerrold was arrested and placed in a lineup. Chris Jackson identified Jerrold as the one he saw shooting the .45-caliber handgun. However, Chris never said the shooters fled to a car, nor did Chris mention Derrold Davis.

In a second lineup, Williams also identified Jerrold as the shooter of the handgun.

While continuing his investigation, Gilger encountered a car full of Black P-Stone gang members. He saw the car and noticed that one of them, McKenzie Clark, matched the description of the offender with the shotgun. Clark said he had heard of the murder and accompanied Gilger back to the station.

After informing Clark of his *Miranda* rights, Gilger asked Clark about the murder. Clark said that the day after the murder, Jerrold admitted shooting at people on Laramie the previous night. Clark said Jerrold said he had a shotgun and that a man whose nickname was Bird was shooting a .45-caliber handgun. After taking a polygraph test, Clark told Gilger that Jerrold said it was a .45-caliber handgun, not a shotgun, that he had during the shooting.[1]

Detective Lawrence Poli testified he first came into contact with Derrold on August 10, 1998, near the scene of an unrelated shooting. Poli took Derrold and several others to the police station for questioning in the unrelated shooting sometime between 2 and 4 a.m. Sometime between 4 and 5 a.m., Poli turned Derrold over to Gilger because Gilger told him Derrold was wanted in connection with the murder of Larion Jackson.

Later that day, at 9 p.m. on August 10, 1998, Gilger placed Derrold in a lineup. Williams viewed the lineup but did not make any identification. After Williams failed to identify Derrold in the lineup, Derrold was not released.

Detective Richard Maher testified that he and Detective Pallohusky spoke with Derrold on August 10, 1998, at 9:30 p.m. Prior to speaking with Derrold, Maher advised him of his *Miranda* rights. Derrold indicated he understood those rights.

When questioned about the shooting, Derrold denied involvement in the shooting although he said he had heard about it. He told the detective he knew Bird and that Bird's real name was Reginald Wilberton.

Derrold also told the detectives he was with his brother, Jerrold Davis, at his uncle Solomon Davis's home near 145th Street on July 7, 1998. Derrold was unable to provide a more specific address or a phone number. Maher tried to learn more about Solomon Davis but was unsuccessful.

Gilger spoke with Derrold on August 11 at about 6 p.m. During this interview, Derrold confessed to participating in the shooting.

At the conclusion of the hearing, the trial court ruled the police had probable cause to arrest Derrold. The trial court based its ruling on the statement that Williams made to the police regarding Derrold's involvement, evidence that corroborated other portions of Williams'

---

[1]A jury convicted Jerrold of the first-degree murder of Larion Jackson and the attempted first-degree murder of Chris Jackson. Jerrold was sentenced to 40 years and 30 years, respectively. We affirmed his convictions in *People v. Jerrold Davis*, No. 1—01—0202 (2002) (unpublished order under Supreme Court Rule 23).

statement, such as Chris Jackson's identification of Jerrold Davis as one of the shooters, and Derrold's familiarity with Bird.

## VOLUNTARINESS HEARING

Derrold also filed a motion to suppress, contending his statements were not voluntary. At the hearing, Derrold offered no testimony or other evidence in support of his motion. The State presented the following evidence:

Derrold had been in the police station since the early morning hours of August 10, 1998, on an unrelated case. During that time, he had been in the lockup or in an interview room.

Maher testified he and Pallohusky spoke with Derrold on August 10, 1998, at 9:30 p.m., after advising him of his *Miranda* rights. Maher and Pallohusky spoke with Derrold for about 15 to 20 minutes.

Maher said he never hit Derrold on the chest or arms or shoved Derrold against the bars of a holding cell. Derrold never complained to Maher that anyone had hit him or shoved him against the bars of a holding cell. Neither Maher nor Pallohusky showed Derrold a gun to scare him into confessing to the murder. Nor did Derrold tell Maher that anyone showed him a gun to scare him into confessing.

Gilger testified that on August 11, 1998, at about 6 p.m., he spoke with Derrold in an interview room. Derrold was not handcuffed at that time. Gilger first advised Derrold of his *Miranda* rights from a preprinted card. Derrold said he understood his rights. He then said he wanted to talk to Gilger about the murder of Larion Jackson. During that conversation, Derrold confessed to his role in the shootings.

Gilger then called Assistant State's Attorney (ASA) Dan Groth. Sometime after midnight on August 12, 1998, Groth, Gilger, and Derrold spoke. Groth advised Derrold of his *Miranda* rights. Derrold acknowledged he understood these rights and wanted to speak with them about the murder of Larion Jackson. As Groth questioned him, Derrold gave an inculpatory statement.

The interview with Groth lasted about half an hour. During that time, Groth asked the questions; Gilger asked none. Derrold looked fine to Gilger.

After that first half-hour conversation with Derrold, Groth and Gilger left the interview room for less than half an hour. They returned to the room, and Groth and Derrold discussed how Derrold could memorialize his statement. Derrold decided on a handwritten statement.

Groth then asked Gilger to leave the room. When Gilger returned, a handwritten statement was prepared and reviewed by Gilger, Groth, and Derrold. Groth read the statement out loud to Derrold. He was al-

lowed to make corrections to the statement. Then Derrold, Groth, and Gilger signed each page of the statement.

Gilger testified that during the questioning Derrold never asked for a lawyer, never was hit in the chest and arms or shoved against the bars of a holding cell by anyone, and never was shown a gun to scare him into confessing. Nor did Derrold ever tell Gilger that anyone showed him a gun to scare him into confessing.

In denying Derrold's motion to suppress, the trial court based its ruling on unrefuted evidence that Derrold was repeatedly advised of his *Miranda* rights and on the lack of evidence of coercion.

## TRIAL

At trial, Chris Jackson testified that on July 7, 1998, at about 2:30 a.m., he, Larion, and about five or six friends were on the porch of 512 North Laramie playing cards. At about 2:37 a.m., Chris heard gunfire coming from the gate that was about 10 feet in front of the porch and next to the sidewalk. Chris saw two men at the gate, one with a shotgun and one with a handgun. Chris was able to see the face of the man with the handgun. He also saw fire coming from the handgun. Chris heard about seven shots.

Everyone on the porch then scrambled to get into the house. Chris ran to the back of the house then returned to the porch. He found Larion laying on the front porch—Larion had been shot.

After the shooting, Chris spoke with police about the shooting. Chris did not recall seeing a car pull up or parked near his house, nor did he see Williams out that night. Chris said he did not hear a car going down the street, brakes screech, or tires squeal. He did not know whether Derrold Davis was there that night.

Larion's autopsy revealed he died of a gunshot wound to the head. Forensic evidence and firearm comparisons showed seven cartridge casings and two fired bullets were recovered from the scene. They were all from a .45-caliber gun and were fired from the same gun. A shotgun shell was found at the scene, and shotgun wadding was found under Larion's body.

Gilger testified that on July 9, 1998, he and a sergeant canvassed the area for witnesses to the shooting. He saw Jemar Williams near his home. From Williams' home there is an unobstructed view of 512 North Laramie.

Gilger said Williams is a member of the Traveling Vice Lords gang. Gilger asked Williams if he knew anything about the shooting, and Williams responded that he had witnessed it and gave Gilger a brief summary of what happened. Gilger then took Williams to the Area 5 police station to formally interview him. Gilger recounted the conversation he had with Williams at the police station.

Gilger said Williams told him he knew the twins and could tell them apart because one has a birthmark on his face. Williams said the twin with the birthmark was the shooter. Williams also said the twins were members of the "Stones."

Gilger went looking for the twins and found Jerrold Davis. He placed Jerrold under arrest for murder. Chris Jackson identified Jerrold in a lineup as the shooter with the handgun. Williams also viewed a lineup and identified Jerrold as the shooter with the handgun.

Gilger contacted the State's Attorney office. ASA Merle Shearer responded and interviewed Williams. Williams agreed to give a handwritten statement. Shearer then prepared the statement in Williams' presence and reviewed it with Williams. The handwritten statement was substantially the same as his oral statement to Gilger, although there were some differences.

According to the statement, dated July 11, 1998, at about 2:30 a.m. on July 7, 1998, Williams was outside on his front porch visiting with a girl. He noticed a four-door Ford Tempo pull up in front of 512 North Laramie. Williams recognized the driver as Derrold and the passenger as Jerrold. He referred to photographs attached to the statement and identified Derrold and Jerrold.

A third person, whom Williams did not recognize, was sitting in the backseat of the car. When the car pulled up, Jerrold got out of the car. Williams said Jerrold had a semiautomatic handgun, either a .9-millimeter or a .45-caliber handgun, black steel. The man from the backseat also exited the car. He was carrying a pump action shotgun.

Williams saw Jerrold walk to the gate surrounding the front yard and open it. The third man was behind and to the side of Jerrold. Williams said a card game was going on on the front porch and about 15 to 18 people were on the porch. Jerrold opened fire on the people, and the people scrambled to get into the house. Jerrold fired more than 10 shots. The third man fired the shotgun twice. Williams saw a man, who he later learned was Larion, get hit and "go down."

Shearer added that Williams said several times he knew the defendants, knew they were involved in gangs, and was fearful of giving the statement. Shearer said Williams told him he no longer was in a gang at the time of the statement.

At trial, Williams disclaimed his oral and written statements. Williams testified that on July 7, 1998, at about 2:30 a.m., he was asleep in bed. He did not hear the shooting and did not see who did it. At around 10 a.m. on the morning after the shooting, Williams learned Larion had been killed from friends and relatives. Williams had known Larion for about 10 years.

Williams admitted signing a statement that said he witnessed the

shooting, but he said he did not provide the information in the statement. He also said he signed the statement because Gilger threatened him. Williams' signed statement was admitted as substantive evidence. See 725 ILCS 5/115—10.1 (West 1998).

Williams said although he has "seen" Derrold and Jerrold for 10 years, he did not know them and could not tell the twins apart. He denied knowing whether they had nicknames and said he did not know whether one had a birthmark on his face. He did know that both Derrold and Jerrold were members of the Blackstones.

Williams also admitted he identified Jerrold in a lineup as the person he saw shooting a handgun at the porch of 512 North Laramie. He said when he identified Jerrold in the lineup, he was lying for the police—they told him what to say, and he said it.

In August 1998, Williams viewed a lineup with Derrold in it. He did not identify Derrold because he no longer was worried about the police after speaking with a lawyer.

Gilger continued looking for the other twin, Derrold. On August 10, 1998, at about 5 o'clock in the morning, Gilger learned Derrold was at the police station. Derrold was then placed in custody for the shooting of Larion.

Gilger did not return to work until the night of August 11, 1998. Derrold was in custody. So was Reginald Wilberton, the person identified as the shotgun shooter. At about 6 p.m. that evening, Gilger interviewed Derrold in an interview room. Derrold admitted his role in the shootings.

On August 12, 1998, Groth went to the police station and spoke with Gilger. After reviewing reports about the shooting, Groth then spoke with Derrold.

After Groth advised Derrold of his rights and Derrold acknowledged he understood them, Derrold agreed to speak with Groth. Derrold did not have any visible injuries, had no complaints, and appeared to be fine. After their conversation, Groth asked Derrold if he wanted the conversation memorialized. Derrold said he wanted to give a handwritten statement.

Groth prepared the statement as Derrold provided the information, and the two reviewed it. Derrold, Groth, and Gilger signed each page of the statement. Groth read Derrold's statement to the jury.

In the statement, Derrold said that on July 7, 1998, he, Jerrold Davis, Reginald Wilberton, and a fourth person, nicknamed "Boss," got in a car. There were guns wrapped in blankets in the backseat. Jerrold unwrapped a .45-caliber handgun; Boss unwrapped a .357 revolver; Wilberton unwrapped a shotgun.

Derrold said when he saw the guns he knew they were "going to

shoot at Undertaker ViceLords." Derrold drove to Laramie and stopped the car about 1½ houses away from where some Undertakers were on a porch. Derrold told Wilberton he did not think the people on the porch were Undertaker ViceLords, but Wilberton said, "We'll get them anyway."

Derrold said Jerrold, Boss, and Wilberton fired at the people on the porch until they were out of ammunition. When the three were finished shooting, they ran back to the car. Derrold then drove down Ferdinand to an alley where they abandoned the car.

Gilger testified about the gangs in the area. Three gangs operated in the area near Laramie and Ferdinand in the summer of 1998: the Traveling Vice Lords, the Undertaker Vice Lords, and a faction of the Black P-Stones. Gangs make money primarily through the sale of narcotics. In the summer of 1998, the Black P-Stones street gang and the Traveling Vice Lords were at war over the right to sell drugs on the 5200 block of Ferdinand. The 500 block of North Laramie and the 5200 block of Ferdinand are both part of the intersection of Ferdinand and Laramie. The war resulted in violence in the area.

Derrold presented the testimony of Jacqueline Williams, Jemar Williams' mother. Jacqueline Williams testified that on July 6, 1998, Jemar Williams went to bed after 10 p.m. Later that night, she heard gunshots. When she heard the shots, she checked on Jemar and found him in his room sleeping. She also said although Jemar was member of the Traveling Vice Lords in the past, he no longer was a member.

Derrold testified that on July 7, 1998, he and Jerrold were at the house of their uncle, Solomon Davis, Jr. Solomon lives on 145th and Saginaw. On August 10, 1998, Derrold's uncle, Alexander Young, took him and several others to the police station to report an unrelated shooting and car accident. Derrold and the other passengers of the car were transported to the Area 5 police station where the three were separated. Derrold was taken to the lockup. Derrold said at the time he was arrested he was a member of the Black P-Stones, but no longer was a member.

He was questioned by two detectives and later by Gilger. Gilger told Derrold that Jerrold was in custody and the police wanted to know who had fired the shotgun. Derrold said Gilger was angry during this conversation. Gilger then returned Derrold to the lockup.

Gilger then took Derrold out of lockup again for more questioning. This time, Derrold says, Gilger shoved him, causing him to fall and hit his face on a metal bench in the interview room. Gilger later punched Derrold in the chest several times. Derrold finally sat down and said he would cooperate.

When the ASA arrived, Derrold told the ASA the story he was

coached to tell by Gilger. Derrold signed the statement because he thought that if he did not, Gilger would continue to beat him.

Derrold says he was aware of a conflict between the Black P-Stones and Vice Lords in the summer of 1998. The conflict resulted in shootings. Derrold, however, did not know whether the conflict was over the right to sell drugs in a particular area. He did say 512 North Laramie was in Vice Lord territory.

Derrold admitted he learned his brother was arrested for murder on July 13, 1998, but he never went to the police to tell them about Jerrold's alibi. He said he did not go to the police because the lawyer handling the case did not tell him to.

Derrold introduced the testimony of Alexander Young to corroborate his testimony about what happened on August 10, 1998. He also introduced the testimony of Villetta Billingsly, who said she saw a bruise on Derrold's face on August 14, 1998.

Solomon Davis, Jr., testified on behalf of Derrold, essentially corroborating Derrold's alibi. Solomon said he picked up Derrold and Jerrold, as well as another nephew of his, and took them to his house for the July 4 weekend. Solomon said they were at his house the entire time, and he did not drop them off at their house until about 11 a.m. on July 7, 1998. Solomon admitted he never went to the police station to tell anyone Jerrold and Derrold could not have been involved in the shooting because they were with him.

## DECISION

### PROBABLE CAUSE

Derrold contends the trial court erred in ruling the police had probable cause to arrest him and in denying his motion to suppress his statements. We disagree.

As a preliminary matter, we address Derrold's contention that we should rely on evidence presented at trial to reverse the trial court's ruling on probable cause. Derrold cites *People v. Caballero*, 102 Ill. 2d 23, 464 N.E.2d 223 (1984). Derrold's reliance on *Caballero* is misplaced.

■ In *People v. Brooks*, 187 Ill. 2d 91, 718 N.E.2d 88 (1999), the supreme court clarified the application of *Caballero*. A reviewing court may use evidence presented at trial to *affirm* a trial court's denial of a motion to suppress. *Brooks*, 187 Ill. 2d at 127. When, however, the defendant asks the reviewing court to rely on trial evidence to *reverse* the trial court's ruling, the defendant must properly preserve the issue in the trial court by asking the trial court to reconsider its ruling on the motion to suppress at the time the new evidence is introduced at trial. *Brooks*, 187 Ill. 2d at 127-28. When the defendant fails to do

so, he waives his right to argue suppression based on evidence presented at trial. *Brooks*, 187 Ill. 2d at 128.

■ Here, Derrold did not ask the court at any time during the trial to reconsider its ruling on the motion to quash arrest and suppress evidence based on new evidence presented at trial. We decline his invitation to consider evidence presented at trial *in support* of his contention.

■ We review determinations of probable cause *de novo. People v. Aguilar*, 286 Ill. App. 3d 493, 496, 676 N.E.2d 324 (1997). But "we will not disturb findings of fact absent clear error and will give due deference to inferences drawn from those facts by the trial court and arresting officers." *Aguilar*, 286 Ill. App. 3d at 496.

■ A defendant has a constitutional right to be free from unreasonable searches and seizures. *Dunaway v. New York*, 442 U.S. 200, 207, 60 L. Ed. 2d 824, 832, 99 S. Ct. 2248, 2253 (1979). An arrest made without a warrant is unreasonable unless it falls within a well-defined exception, such as probable cause. *People v. Drake*, 288 Ill. App. 3d 963, 967, 683 N.E.2d 1215 (1997).

Probable cause is "reasonable ground to believe that the suspect has committed, or is committing, a felony." *People v. Sims*, 167 Ill. 2d 483, 500, 658 N.E.2d 413 (1995). Police officers have probable cause to arrest the defendant when "facts exist that would lead a reasonable person standing in the shoes of the police officers to conclude that a crime has been committed and the defendant was the person who committed the crime." *People v. Robinson*, 167 Ill. 2d 397, 405, 657 N.E.2d 1020 (1995). Probable cause is determined "according to the totality of the circumstances confronting the officers at the time of the arrest." *Sims*, 167 Ill. 2d at 500.

■ Information provided by an informant which the police rely on to establish probable cause "must be supported by some indicia of reliability." *People v. James*, 118 Ill. 2d 214, 222, 514 N.E.2d 998 (1987). One indicia exists "when the facts learned through police investigation independently verify a *substantial part* of the informant's tip." (Emphasis added.) *People v. Williams*, 305 Ill. App. 3d 517, 525, 712 N.E.2d 883 (1999). The substantial part that is verified does not necessarily have to be the portion implicating the defendant. *James*, 118 Ill. 2d at 225 ("when part of [the informant's] story has been verified, the corroboration lends credence to the remaining unverified portion").

■ In this case, the police had probable cause to arrest Derrold when they initially detained him on August 10, 1998. The probable cause was based largely on Jemar Williams' statements about the shooting. In both his oral statement to Gilger and his handwritten statement, Williams said he witnessed the shooting. In his oral state-

ment he identified the driver of the getaway car as the twin brother of the shooter with the handgun. In his written statement, Williams identified Derrold by name and photograph as the driver of the getaway car. Trial testimony about Williams' written statement may be used to support affirmance of the trial court's denial of Derrold's motions to suppress. See *Brooks*, 187 Ill. 2d at 127.

Although the portion of Williams' statements about Derrold was not directly corroborated, corroboration of another part of his statement "lends credence to the remaining unverified portion." *James*, 118 Ill. 2d at 225. The information available to the police at the time of the arrest corroborated other portions of Williams' statements.

Chris Jackson's account of the two shooters, one with a handgun and one with a shotgun, was consistent with Williams' account. Williams identified Jerrold in a lineup as the shooter of the handgun. Chris also identified Jerrold as the shooter of the handgun. Clark told police Jerrold confessed (1) he shot at the people on Laramie with a handgun; (2) a man nicknamed Bird was with him; and (3) Bird had a shotgun.

Based on the totality of circumstances confronting the officers at the time of the arrest, the officers had a reasonable basis to conclude Derrold had committed a felony.

We next consider a question that has not been raised by either party: Did Williams' failure to identify Derrold after Derrold's lawful arrest but before his first confession so dissipate probable cause as to render his detention illegal?

█ An arrest that was originally lawful may become unlawful when the police uncover additional facts dissipating probable cause. See *People v. Quarles*, 88 Ill. App. 3d 340, 342-43, 410 N.E.2d 497 (1980). In *People v. Quarles*, the defendant was arrested for attempted burglary after two people told the police he was trying to break into their apartment. The police investigation disclosed the two people had no possessory interest in the apartment and that the defendant had permission to live in that apartment. Instead of releasing the defendant, police questioned him about an unrelated burglary. Shortly after, the defendant confessed to that crime. *Quarles*, 88 Ill. App. 3d at 340-41. The trial court denied the defendant's motion to suppress. *Quarles*, 88 Ill. App. 3d at 341.

On appeal, the court found that while police had probable cause to arrest the defendant at the time of the arrest, that probable cause no longer existed after the police learned he had permission to be in the apartment. *Quarles*, 88 Ill. App. 3d at 342. His continued detention was without probable cause and was unlawful. *Quarles*, 88 Ill. App. 3d at 341-42.

Here, Williams failed to identify Derrold in a lineup after the arrest, but in his written statement Williams identified Derrold by name and identified Derrold's photograph. Moreover, the police were aware of other evidence that strongly corroborated Williams' eyewitness account. We conclude that while Williams' failure to identify Derrold did diminish probable cause, it did not eliminate probable cause given the other information available to police at the time. Enough of it remained to support probable cause to detain Derrold at the time he confessed.

## VOLUNTARINESS OF THE CONFESSION

■ Derrold contends his confession was not voluntary because he was not advised of his *Miranda* rights and because it was the result of a "coercive police environment."

In support of his position, Derrold relies on his trial testimony. There, he said he was beaten, threatened, and otherwise mistreated before he gave his first inculpatory statement. Derrold offered no evidence of coercion during the hearing on his motion to suppress the confession. Nor did he ask the trial court to reconsider its ruling denying the motion to suppress.

All we may consider, then, is the testimony at the pretrial hearing. See *Brooks*, 187 Ill. 2d at 128. We have before us the unrebutted testimony of State witnesses that there was no coercion. We also have the fact that Derrold was in custody for about 36 hours before his first confession.

Although the lengthy detention is troubling, standing alone it is not enough, applying the *de novo* standard of review, to reverse the trial court's ruling. See *People v. Dodds*, 190 Ill. App. 3d 1083, 1090-92, 618 N.E.2d 279 (1989) (defendant's detention of 30 hours before his confession did not alone render his statement involuntary).

We conclude the trial court did not err when it ruled the statement was voluntary.

## GANG TESTIMONY

■ Derrold contends the trial court committed reversible error by allowing gang testimony at trial. Derrold specifically objects to Gilger's testimony about gang structure and gang rivalries and to Williams' gang testimony. Derrold contends the gang testimony was (1) irrelevant because "[t]here was never any testimony that [Derrold] or [Larion] were gang members or that their connection to one another was gang related," and (2) "highly prejudicial," introduced "solely to inflame the jury and appeal to their general bias against gang activity and the status of gang members in our society." We disagree.

The decision to admit gang evidence is within the discretion of the

trial court and will not be overturned absent an abuse of that discretion. *People v. Hamilton*, 328 Ill. App. 3d 195, 202, 764 N.E.2d 1240 (2002).

Relevant evidence is that which tends to prove or disprove a disputed fact or render the matter in issue more or less probable. *People v. Cruzado*, 299 Ill. App. 3d 131, 141, 700 N.E.2d 707 (1998). Gang evidence is relevant when, among other things, it provides motive for an otherwise inexplicable act or corroborates a defendant's confession. *People v. Williams*, 324 Ill. App. 3d 419, 431, 753 N.E.2d 1089 (2001). In particular, any evidence that tends to show the defendant had a motive for killing the victim is relevant because it enhances the probability that the defendant did kill the victim. *People v. Carson*, 238 Ill. App. 3d 457, 464, 606 N.E.2d 363 (1992).

Here, Derrold admitted a gang motive for the shooting. He said he had been a member of the Black P-Stones gang. In his confession, Derrold said his gang was "at war" with the Undertaker Vice Lords. Derrold and his co-offenders went to 512 North Laramie on the night of the shooting to shoot at rival gang members.

Gilger's and Williams' testimony corroborated Derrold's statement regarding the gang war. Their testimony explained the gang war was over the right to sell drugs in the area where the shooting occurred. The gang testimony also showed that shootings are a common product of gang "war[s]."

True, no evidence was presented showing Larion Jackson was in a gang, but that does not undermine the relevance of the gang evidence. Derrold said *he thought* his co-offenders were going to shoot at members of a rival gang.

There may be a strong prejudice against street gangs in the Chicago area. *Hamilton*, 328 Ill. App. 3d at 202. This prejudice attaches to evidence of defendant's gang membership, but that alone does not render gang evidence inadmissible. *Williams*, 324 Ill. App. 3d at 433. Gang evidence is admissible despite the prejudice that attaches if it is relevant and particularly if it is crucial in establishing motive. *Cruzado*, 299 Ill. App. 3d at 142-43.

Derrold relies on *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995), where the court said evidence of gang rivalries was more prejudicial than probative where both the defendant and the victim were members of the same gang. *Mason* is markedly different. In *Mason*, both the victim and the defendant were members of the *same* gang, so evidence of gang *rivalries* carried little relevance. *Mason*, 274 Ill. App. 3d at 722. In the balance, relevance was not outweighed by the danger of unfair prejudice. *Mason*, 274 Ill. App. 3d at 722.

Here, evidence of gang wars was particularly relevant because

Derrold said he believed his armed passengers were going to shoot at rival gang members. We cannot say the risk of unfair prejudice to Derrold substantially outweighed the probative value of the evidence. The trial court did not abuse its discretion in admitting the gang testimony of Williams and Gilger.

## DETECTIVE GILGER'S EXPERT TESTIMONY REGARDING GANGS

Derrold contends Gilger's expert testimony about gangs was inadmissible for two additional reasons: (1) the detective was not qualified as an expert; and (2) expert testimony regarding gang lifestyle was not necessary to understand the evidence.

■ To determine whether the trial court erred in allowing Gilger to testify about the gangs in the area where the shooting occurred, we employ a three-part test: (1) Did Gilger's testimony qualify as an expert's opinion? (2) Was the testimony relevant? and (3) Does the unfairly prejudicial effect of the testimony substantially outweigh its probative value?[2] *Williams*, 324 Ill. App. 3d at 430.

We have said Gilger's testimony was relevant and the probative value of his testimony was not substantially outweighed by the danger of unfair prejudice. The remaining question is whether Gilger was properly qualified to provide opinion testimony regarding the gangs active in the area of the shooting.

■ A trial court's determination that a witness is qualified as an expert will not be overturned absent an abuse of discretion. *People v. Jackson*, 145 Ill. App. 3d 626, 635, 495 N.E.2d 1207 (1986). "A witness qualifies as an expert if 'because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person.'" *People v. Ayala*, 208 Ill. App. 3d 586, 593, 567 N.E.2d 450 (1990), quoting *Jackson*, 145 Ill. App. 3d at 633. Specialized formal training is unnecessary, and experience alone may qualify a person as an expert. *Ayala*, 208 Ill. App. 3d at 593.

In *People v. Barajas*, 322 Ill. App. 3d 541, 749 N.E.2d 1047 (2001),

---

[2]*People v. Williams*, as well as other cases that utilize this three-prong analysis, require only that "the prejudicial effect of the testimony [not] outweigh its probative value" for the third prong. *Williams*, 324 Ill. App. 3d at 430; see also, *e.g.*, *People v. Clifton*, 321 Ill. App. 3d 707, 719, 750 N.E.2d 686 (2000); *People v. Jackson*, 145 Ill. App. 3d 626, 633, 495 N.E.2d 1207 (1986). The proper balancing test to determine the admissibility of relevant evidence is whether the danger of unfair prejudice *"substantially outweighs"* the probative value of the evidence. (Emphasis added.) *People v. Lewis*, 165 Ill. 2d 305, 329, 651 N.E.2d 72 (1995).

we held the trial court did not abuse its discretion when it allowed an officer to testify as an expert in the field of gangs. The officer in that case had been a member of the Chicago police department gang tactical unit for eight years. His knowledge of gangs in the area involved in the case came from interviewing citizens, gang members, and police officers. *Barajas*, 322 Ill. App. 3d at 549, 553-54. Gilger's qualifications are similar to those of the officer in *Barajas*.

■ Gilger testified he had been a Chicago police officer for $12^{1}/_{2}$ years. He had been a police detective at Area 5 for the past $3^{1}/_{2}$ years. 512 North Laramie falls within the boundaries of Area 5. He was currently assigned to the aggravated battery mission team and responded mostly to shootings. He investigated homicides as well. Prior to being a detective at Area 5, he was a patrolman for six years and a gang officer for two years in the 15th District. 512 North Laramie also falls within the boundaries of the 15th District.

As a gang officer, Gilger's duties were to identify known gang members in the 15th District, to suppress any kind of gang activity, identify leaders of each individual gang, and gather intelligence on gangs in the 15th District. He gathered intelligence by speaking to known gang members, gang members he has arrested, other officers assigned to the 15th District, gang officers and other tactical officers in the 15th District, detectives from Area 5, and other law enforcement agencies. Gilger said he has interviewed approximately 5,000 known gang members in his career and arrested approximately 800 to 1,000 gang members.

Derrold challenges Gilger's expertise on the ground that it is based on hearsay and Gilger has no personal knowledge about the gangs. However, his knowledge of gangs is based on information of the type reasonably relied on by experts in the field of street gangs—talking with a variety of sources including gang members, other officers, and other agencies. See *People v. Clifton*, 321 Ill. App. 3d 707, 720-22, 750 N.E.2d 686 (2001). We have recognized this may be the only way to develop intelligence on gangs and their structure. *Clifton*, 321 Ill. App. 3d at 722.

We reject Derrold's contention that expert testimony about gangs was not needed to understand the evidence at trial. The average layperson has no understanding of the workings of the gangs active around the area of the shooting, the conflict between the Black P-Stones and Vice Lords in that area, and the source of that conflict. See *Clifton*, 321 Ill. App. 3d at 720 (testimony about structure of gang qualified as expert testimony where there was no showing that the average layperson has any understanding of the inner workings of gangs).

Because of Gilger's qualifications and the basis for his knowledge about gangs, we cannot say the trial court abused its discretion in allowing Gilger to testify about the gangs active in the area of the shooting and about the conflict that existed between them in the summer of 1998.

## REASONABLE DOUBT

Derrold contends the State failed to prove him guilty beyond a reasonable doubt. In particular, Derrold says the State did not present any evidence that Derrold or his co-offenders had specific intent to kill Larion Jackson or Chris Jackson. Their intent could have been "only to scare." Derrold also challenges Williams' credibility and contends he presented unrefuted evidence of an alibi. We disagree.

In reviewing Derrold's contention, we must consider "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the prosecution." *People v. Hopkins*, 201 Ill. 2d 26, 40, 773 N.E.2d 633 (2002). "[A] person is legally accountable for the criminal conduct of another if '[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense.' " *People v. Ivory*, 333 Ill. App. 3d 505, 512 (2002), quoting 720 ILCS 5/5—2(c) (West 1996).

To prove the requisite intent, the State may present evidence that establishes beyond a reasonable doubt that (1) the defendant shared the criminal intent of the principal or (2) there was a common design. *People v. Williams*, 193 Ill. 2d 306, 338, 739 N.E.2d 455 (2000). Both intent and common design may be inferred from the circumstances surrounding the commission of the crime. *Williams*, 193 Ill. 2d at 338-39. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *Williams*, 193 Ill. 2d at 339.

The State provided more than sufficient evidence from which a rational trier of fact could conclude that Derrold was proved accountable for the first-degree murder of Larion Jackson, the attempted first-degree murder of Chris Jackson, and the aggravated discharge of a firearm beyond a reasonable doubt.

First, the State introduced into evidence Derrold's confession.

Second, the State introduced Williams' statements in which he gave an eyewitness account that corroborated much of Derrold's state-

ment, including Derrold driving the getaway car. Although Williams recanted at trial, his first statements were admitted as substantive evidence. See 725 ILCS 5/115—10.1 (West 1996).

Third, the State offered the eyewitness testimony of Chris Jackson. It corroborated portions of both Derrold's and Williams' statements.

Fourth, the State offered testimony regarding the physical evidence found at the scene that corroborated the eyewitness accounts.

Derrold contends Williams' written statement is not credible since Williams testified at trial he did not provide the information in the statement and because there are misspellings and inconsistencies in it. We do not agree. It is not our function to retry Derrold. *People v. Scott*, 318 Ill. App. 3d 46, 53, 740 N.E.2d 1201 (2000). "It is the responsibility of the trier of fact to resolve contradictory evidence and factual disputes and to weigh the credibility of the witnesses." *Scott*, 318 Ill. App. 3d at 53. Moreover, it is the prerogative of the trier of fact to reject the witness's trial testimony and accept his prior statement. See *People v. McDonald*, 276 Ill. App. 3d 466, 474, 658 N.E.2d 1251 (1995). We have previously upheld a conviction after the only witnesses placing the defendant at the scene disclaimed their previous statements at trial. See *People v. Fields*, 285 Ill. App. 3d 1020, 675 N.E.2d 180 (1997).

Taking the evidence in the light most favorable to the State, a rational trier of fact could have found the State proved beyond a reasonable doubt that Derrold was accountable for the shooting.

## EVIDENTIARY RULINGS

■ Derrold contends the trial court abused its discretion in making numerous evidentiary rulings. Derrold provides several general statements of law on admissibility, then lists 22 instances of alleged improper rulings. For none of the 22 instances did Derrold comply with the requirements of Supreme Court Rule 341(e)(7) by supporting his contentions with "citation of the authorities *and* the pages of the record relied on." (Emphasis added.) 177 Ill. 2d R. 341(e)(7).

We are "not a depository in which defendant may dump the burden of argument and research." *People v. Williams*, 267 Ill. App. 3d 82, 86, 640 N.E.2d 981 (1994) (defendant waived review of arguments by providing one paragraph in support of each with no citations to the portions of the record relied on and no citation to relevant authority). By failing to comply with the requirements of Supreme Court Rule 341(e)(7), Derrold waived our review of these issues. *Williams*, 267 Ill. App. 3d at 86.

## PROSECUTORIAL MISCONDUCT

■ Derrold contends the State made numerous inappropriate remarks during the trial, denying him a fair trial. Although Derrold

failed to follow Supreme Court Rule 341 here as well, we do address Derrold's main contention.

In the State's closing arguments, the prosecutor several times implied Derrold fabricated his alibi at the last minute. This is a sample:

> "Nobody should be surprised at the eleventh hour, last second efforts of bringing his family member in here and presenting you with a bogus alibi that's being presented for the first time.
> ***
> Nothing [regarding the alibi] for you and nothing for us until the last possible second so that it can't be investigated and it can't be checked out and it can't be disproven because it's a bogus alibi. It's nonsense because if an alibi existed it would have come out long ago.
> ***
> If we heard about an alibi a year ago maybe we could have checked it out."

The State says the remarks were justified because: (1) Solomon Davis, Jr., never reported this alibi to the police even after he learned his nephews had been arrested; and (2) the State never heard the details of the alibi until Solomon testified.

The State did not have a good-faith basis to imply to the jury that Derrold's alibi was concocted at the last minute. The record shows on August 10, 1998, Derrold told police he was at his uncle Solomon Davis's house on 145th Street the night of the shooting. While Derrold was unable to provide a more specific address or phone number, police knew the name of his uncle and the approximate area where he lived.

The prosecutor was aware of this information at least as early as June 14, 1999, the date of the probable cause hearing. At the hearing, Maher testified Derrold told him he was with Jerrold at Solomon Davis's house at the time of the shooting.

Although the information was not introduced at trial, the State was aware Derrold had been contending he had an alibi. The State, contrary to its assertions during final argument, had enough time to investigate this alibi. The alibi was not an eleventh-hour concoction, and the State acted disingenuously when it told the jury otherwise.

Although the State's remarks were inappropriate, they do not constitute reversible error, given the strong evidence in support of Derrold's conviction. See *People v. Simmons*, 331 Ill. App. 3d 416, 421, 770 N.E.2d 1271 (2002) ("Even where certain remarks are found to be improper, they will not be considered reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused such that the verdict would have been different had they not been made" (citing *People v. Terry*, 99 Ill. 2d 508, 517, 460 N.E.2d 746 (1984))).

## CONCLUSION

For the foregoing reasons, we affirm Derrold's conviction.

Affirmed.

SOUTH, P.J., and HALL, J., concur.