2021 IL App (2d) 200158-U
No. 2-20-0158
Order filed December 1, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2915 |
| RENEIL R. DOWNER, | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Birkett and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   At defendant's trial for aggravated domestic battery based on the infliction of great bodily harm, the trial court did not err in allowing the physician's assistant who treated the victim to offer expert testimony on her diagnosis of the victim's injuries, although the State had not tendered the witness as an expert before her testimony. Moreover, any error in admitting the testimony was harmless given the other evidence that defendant inflicted great bodily harm upon the victim.

¶ 2   Following a bench trial, defendant, Reneil R. Downer, was convicted of aggravated battery,

a Class 3 felony (720 ILCS 5/12-3.05(a)(1), (h) (West 2018)), and aggravated domestic battery, a

Class 2 felony (§ 12-3.3(a), (b)).   In this timely appeal, defendant argues that he is entitled to a

new trial because the trial court allowed the State to present the expert testimony of Leigh Boone—

the physician's assistant who treated the victim, Michel Ramirez—without first tendering Boone as an expert and laying a foundation for her expert testimony. Defendant argues that this error was compounded when the court expressly relied on Boone's expert testimony to find that defendant caused Ramirez great bodily harm.[1] We determine that defendant is not entitled to a new trial because (1) although Boone was never officially tendered by the State or accepted by the trial court as an expert witness, she nevertheless was "qualified" to give expert testimony under Illinois Supreme Court Rule 702(a) (Jan. 1, 2011); and (2) even assuming that the admission of Boone's expert testimony was improper, such admission was harmless beyond a reasonable doubt, as the other evidence alone established that defendant caused Ramirez great bodily harm. Accordingly, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4     After defendant was indicted, the State disclosed to defendant a list of witnesses it intended to call at trial. Although Boone was not listed, the State noted that it "reserve[d] the right to call as witnesses any persons referenced in any disclosure of materials to the defendant." In its supplemental answer to defendant's motion for discovery, the State tendered to defendant Ramirez's medical records.

¶ 5     Before trial began, the State moved to introduce statements Ramirez made to Boone while Boone was treating her. Defendant objected, arguing that any statements Ramirez made to Boone should be excluded because Boone was not a physician. The State explained that Boone was the only medical provider Ramirez saw after the incident. The trial court granted the State's motion

---

[1] Aggravated domestic battery requires proof that the defendant "knowingly cause[d] great bodily harm." 720 ILCS 5/12-3.3(a) (West 2018).

over defendant's objection, noting that a physician's assistant "is in the status of a doctor in those situations."

¶ 6    At trial, Ramirez testified that she and defendant started dating in the summer of 2018. In December 2018, Ramirez moved in with defendant and his mother, Joy Downer. Ramirez soon became unhappy in her relationship with defendant. On the evening of December 21, 2018, she told defendant that she wanted to break up. Although defendant seemed initially unfazed, the couple soon began arguing about ending their relationship. Ramirez packed her bags, made plans to leave the next day, and went to sleep alone in another room. The couple continued to argue through text messages.

¶ 7    In the early morning of December 22, 2018, while Joy was upstairs, Ramirez was sitting on a couch on the first floor of the home waiting to leave when defendant sat on the other end of the couch. Defendant accused Ramirez of cheating on him. Ramirez testified that "[defendant] started getting violent, and he started hitting [her]." Ramirez explained that "[defendant] got up and came to [her] face and started yelling, pushing [her]. That's when he got on top of [her] and started hitting [her], hitting [her] in [her] face" with a closed fist. She testified that defendant hit her "more than once," but she could not "remember how many times the defendant hit [her] in the face." However, she knew that defendant hit "[her] left eye, [her] lip, and [her] nose."

¶ 8    Defendant interjected during Ramirez's testimony, telling her to "stop lying." The trial court admonished defendant not to interrupt. The State asked Ramirez again if defendant hit her more than once, and Ramirez responded, "I don't remember."

¶ 9    Ramirez also testified about what happened after defendant hit her. She said that "[o]nce [defendant] hit [her] like—it was just like everything happened so fast like." Ramirez said that

"[she] kind of like blacked out, came back, and that's when [she] ran out the door," grabbing her phone on the way. Defendant ran behind Ramirez, apologizing.

¶ 10    Ramirez testified that, while she was outside, she could feel her eye starting to swell and blood coming out of her nose. Ramirez returned to the home to get her purse. When she went back outside, she called the police, who arrived almost instantaneously.

¶ 11    Ramirez was taken to the hospital, where Boone examined and treated her. Ramirez stated that she could not open her left eye "at all," her nose was bleeding, she was vomiting, and she was "in a lot of pain." Asked if the injury had any lasting effects on her left eye, she replied, "It's still kind of low, like around is still darkened, and every day I see a black dot."

¶ 12    On cross-examination, Ramirez stated that defendant hit her in the face, and she fell to the ground. She explained that "[defendant] struck [her] like one time, and then after that [she didn't] remember," as she "blacked out."

¶ 13    The State introduced photographs of Ramirez taken at the hospital. Her left eye is bruised and swollen shut. There is dried blood around her nose and lip, and the inside of her lip is cut.

¶ 14    Officer Kenneth Piton testified that he was called to the scene. He encountered Ramirez, who "had a rather severe injury to her eye." Officer Piton characterized the injury as severe because Ramirez's left eye was "all bruised and swollen shut." Although Officer Piton stated that "[t]he main injury was [Ramirez's] eye," he also saw that Ramirez "had blood on her lips too and swelling."

¶ 15    A recording taken from Officer Piton's body camera was admitted at trial. When Ramirez approached Officer Piton, he looked at Ramirez and exclaimed, "Whoa." Ramirez pointed to the home, telling Officer Piton that defendant was in there. Officer Piton comforted Ramirez, telling

her that "[i]t's okay," and Ramirez cried out that she "can't open [her] eye." In the recording, Ramirez's left eye appeared swollen shut.

¶ 16    Officer James Kirby was also called to the scene. He "noticed right away [Ramirez's] left eye was swollen shut and bruised." Officer Kirby indicated that he "[c]ould [not] see her eyeball at all." A recording taken from Officer Kirby's body camera was also admitted at trial. In it, defendant denied that he was Reneil Downer, accused the officers of using excessive force, and repeatedly swore at the officers while they took him into custody.

¶ 17    Before Boone testified, defense counsel stated that he wished to file a motion *in limine* to bar parts of her testimony, as she was not a qualified witness. The court explained that Boone was a physician's assistant, "which is very similar to a medical doctor." The court told counsel that he "[could] ask her, if you want to interview her, all of the things that she's qualified to do." The court said that it would "pass the case and let [counsel] have a discussion with [Boone] if [counsel] was] not familiar with that." Counsel declined, saying, "That's fine. I will just file the motion." The court reiterated that it would give counsel time to talk to Boone and would allow counsel to cross-examine her "as to anything [counsel] want[ed]." Counsel replied that he did not need time to talk to Boone.

¶ 18    Boone testified that she worked in the emergency room at Vista Medical Center (Vista) as a physician's assistant. She explained that a physician's assistant is a mid-level practitioner who works under the direction of a supervising physician. To become a physician's assistant, Boone earned a bachelor's degree and then a master's degree in physician-assistant studies. Although the master's degree program can take up to 36 months to complete, Boone earned her master's degree after 27 months. With the master's degree, Boone was qualified to seek licensure as a physician's assistant. Boone became certified as a physician's assistant when she passed the Physician's

Assistant National Certification (PANC) exam in January 2018. With the PANC certification, Boone was allowed to take the Illinois certification exam, which she passed in April 2018. The Illinois certification authorized Boone to prescribe medication for patients.

¶ 19　The same month she became certified in Illinois, Boone began working at Vista as a physician's assistant. She worked 12-hour shifts, treating between 25 and 45 patients each shift. Although, as a physician's assistant, Boone worked under the direction of a supervising physician, the physician did not see all of Boone's patients. It was more common for Boone to be the sole treating medical provider for the patients. Vista categorized patients on a severity scale of one to five. Many of the patients Boone saw were classified as "five." With a "five" classification, "you might have a rash on your skin for a year." However, in addition to these patients, Boone treated one or two trauma patients each shift.

¶ 20　Boone testified that she treated Ramirez in Vista's emergency room on the morning of December 22, 2018. Ramirez, whose main complaint was facial swelling and bruising, "had significant swelling around the left eye with significant bruising around the left eye," and her lip had been bleeding.

¶ 21　When Boone was asked what concerns she had based on her observations of Ramirez, defense counsel made an unspecified objection. The trial court overruled the objection, and Boone testified that she was concerned about a fracture, internal bleeding, and intracranial hemorrhaging. Ramirez told Boone that she had been punched in the face with a fist "several times." When Boone was asked what treatment she gave Ramirez, defense counsel objected that such testimony would exceed the scope of the court's ruling on the State's motion *in limine*. Counsel also asserted that "medical procedures" were not Boone's "expertise" and that she was "not qualified." The trial court overruled the objection.

¶ 22    Boone testified that she asked Ramirez what her pain level was. Ramirez responded that it was "severe." Boone ordered a computerized tomography (CT) scan of Ramirez's head, brain, and maxillofacial region, based on (1) swelling, bruising, and tenderness both in her left periorbital region and left maxillary region and (2) her reported symptoms of headache, dizziness, and nausea without loss of consciousness.

¶ 23    After the CT scan was taken, the radiologist prepared a report. Although Boone was not trained to read the CT scan, she was trained to interpret the results. The State asked if she used the information from the CT scan to make a diagnosis, and defendant objected that Boone was "not a medical expert to offer any type of diagnosis in terms of course of treatment for a medical illness." The trial court asserted that Boone was "not being offered as an expert." The court continued:

> "She is the treating physician's assistant that was working in the emergency room when [Ramirez] came in and was seen. What she testified—at least what I heard her testify— and if you have a different view, I will hear it. She said that she relies on the radiologist report in making her diagnostic decisions, that she is vested with that authority in the emergency room in her capacity as a physician's assistant, and [the State] is about to, *** if I understood [the] question correctly, about to elicit testimony about what she learned from the radiologist['s] report. Certainly[,] that's all subject to cross-examination, and I will hear you, but in my view she is allowed to testify to that. So[,] your objection is overruled. Your disagreement [*sic*] is preserved. I will certainly give you wide latitude in cross-examination as well."

¶ 24    Boone then testified that she learned from the CT scan that Ramirez had a left blowout fracture with a left retroorbital hemorrhage. The State asked Boone to explain those findings "in

layman's terms," and Boone stated that Ramirez had a fracture of the floor of her orbital bone (the bottom of her eye socket) in addition to a collection of blood behind the orbit. The State then asked Boone if she was "able to make a diagnosis as to what [Ramirez] was suffering from." Defendant objected, arguing that Boone, as a physician's assistant and not a medical doctor, was not qualified to render an opinion. The trial court overruled the objection. The court stated:

> "She's not a doctor. She is a physician's assistant. Her degree is different, but it doesn't preclude her from offering that type of testimony. Unless you have a case or something different, *everything I am aware of is she has that expertise. The foundation has been laid to allow her to testify to that.* I will certainly allow you wide latitude in cross-examination, but she is allowed to testify to what she did and what she found." (Emphasis added.)

Boone then stated that her diagnosis was that Ramirez suffered from a left blowout fracture of the orbital bone and retroorbital hemorrhage.

¶ 25 On cross-examination, Boone admitted that she did not offer her curriculum vitae before testifying. When defendant asked Boone if she was ever asked to offer any type of medical opinion regarding Ramirez, the State objected, arguing that it "[was] not tendering the witness as an expert." The trial court responded, "I know," and told defense counsel to continue the questioning. Boone testified that she was "[j]ust now" asked to give her medical opinion.

¶ 26 On redirect examination, Boone testified that she relied on the CT scan and her physical observations of Ramirez to make a diagnosis. However, she admitted that she relied more on the CT scan, as the report from that scan was "definitive." Boone assumed that "a great amount of force" had to have caused Ramirez's eye to "swell to that level."

¶ 27    After Boone testified, the State rested, and defendant moved for a directed finding, arguing that the State did not present evidence of great bodily harm. The trial court denied defendant's motion.

¶ 28    The sole defense witness was Joy, defendant's mother. Joy testified that Ramirez started the fight with defendant on December 21, 2018. Joy warned defendant and Ramirez that she would not allow such loud fighting in her home and would throw them out if they continued.

¶ 29    The next morning, before Joy started getting ready for work, she told Ramirez not to go downstairs, which was where defendant was sleeping. Ramirez disobeyed. Joy heard someone yelling "let go of me, let go of me," and she went downstairs. Joy saw Ramirez holding on to defendant. Joy never saw defendant hit Ramirez, but she did see defendant "strung [Ramirez's] arm" to get Ramirez to let go of him. Joy testified that that was when Ramirez was injured.

¶ 30    The court found defendant guilty of both aggravated battery and aggravated domestic battery. The trial court addressed whether the State established great bodily harm:

"The bottom line is that the testimony that was certainly unimpeached from [Boone] *** suggests that there was a significant injury to the victim that was diagnosed appropriately by [Boone] *** that was within her skill set as a physician's assistant. There is nothing that was inappropriate about her testimony. She was hired and working in that capacity in the emergency room, and she assessed [Ramirez] and acting in much the same way as a medical doctor and with the same type of skill and expertise was allowed to make the diagnosis and allowed to interpret the radiologist['s] report suggesting that there was a blowout fracture of the orbital socket, and there was nothing in any of the evidence that I saw to contradict it in any way, shape or form.

In addition to her testimony regarding the nature and extent of the injury, I have buttressing that the testimony from [Ramirez] where she refers to apparently lasting injuries that inflicted—from the infliction of the damage that continues to this day, including what she described as a *** floating black dot that she sees daily from her left eye in addition to what she described as disfigurement that she continues to observe on a daily basis.

I know that the parties put some stock and wanted to argue about what the defendant's mother, [Joy] said, but frankly, [Joy's] testimony didn't provide much of anything that could help the defense. She did witness what she described as a struggle. I have no doubt that she saw them in close proximity, but her unequivocal testimony led me to believe that she is either not being entirely forthcoming with what she saw or she didn't see the ultimate injury that occurred to [Ramirez], because she said she did not see him hit her.

When questioned by [defendant], she again said I guess that's how it happened, I didn't see him punch her *** [Joy's testimony] completely flies in the face of the evidence that I have before me here, because my conclusion from hearing all of the testimony and the evidence is that [defendant] most certainly hit [Ramirez] hard enough to sustain the injuries that were testified to in an unequivocal and unimpeached fashion. And there is no question in my mind that it amounted to great body harm sufficient to find [defendant] guilty in the manner and form as charged in the indictments of aggravated domestic battery and aggravated battery."

¶ 31    Defendant moved for a new trial, arguing, among other things, that the trial court erred when it allowed Boone to testify about her medical diagnosis of Ramirez's injuries. The court denied the motion. The court stated:

"I will correct a misapprehension I believe the defense is laboring under which is the witness who had testified at trial who is a physician's assistant is not an assistant to a physician. She is a licensed registered physician's assistant in the State of Illinois; and as such, she may opine as to her belief and diagnosis of injuries; she can offer her medical opinion, which she did, as the treating individual when she saw the victim in this case. She opined, and I found to be credible, that the victim suffered an orbital fracture; and that in addition to that, she had permanent and ongoing difficulty. Among the things that I believe I recall her saying was that she still sees black spots out of her eye that was affected which certainly in my view rises well beyond the standard for a determination of great bodily harm which is what I found, and what I continue to find."

¶ 32    At sentencing, the court found that the aggravated battery merged with the aggravated domestic battery. On the latter conviction, the court sentenced defendant to 11 years' imprisonment.[2] The trial court commented on defendant's extensive criminal history; his belligerent behavior toward the police when he was arrested; and his behavior in court, including

---

[2] Because of defendant's criminal record, he was sentenced as a Class X offender. 730 ILCS 5/5-4.5-95(b) (West 2018) ("When a defendant *** is convicted of a Class 1 or Class 2 felony, *** after having twice been convicted in any state or federal court of an offense that contains the same elements as an offense *** classified in Illinois as a Class 2 or greater Class felony, *** that defendant shall be sentenced as a Class X offender.").

his attempt to intimidate Ramirez. The court noted that it was "impressed with how severely violent [defendant is]" and how the harm he caused Ramirez was "brutal," "vicious," and "highly inappropriate."

¶ 33    Defendant moved the trial court to reconsider the sentence. Defendant again argued that the finding of great bodily harm was inappropriate where the State had not tendered a medical expert to testify to that harm. The court denied the motion, finding that the State met its burden of proof on the element of great bodily harm.

¶ 34    Defendant filed this timely appeal.

¶ 35                              II. ANALYSIS

¶ 36    There are two issues raised on appeal: (1) whether the trial court erred in allowing the State to present expert testimony from Boone on her diagnosis of Ramirez's injuries where the State did not tender, and the trial court did not accept, Boone as an expert witness; and (2) assuming the court did err, whether there was adequate evidence, apart from Boone's testimony, that defendant caused Ramirez "great bodily harm." We consider each issue in turn.

¶ 37                           A. Expert Testimony

¶ 38    The first issue we address is whether the trial court erred in allowing the State to present expert testimony from Boone without first tendering her as an expert and laying a foundation for her testimony. In addressing that issue, we note that the parties disagree about the correct standard of review. The State claims that, because this appeal involves a review of an evidentiary ruling, we must employ an abuse-of-discretion standard of review. *People v. Crump*, 319 Ill. App. 3d 538, 572 (2001). While acknowledging that rulings on the admissibility of evidence are generally reviewed for an abuse of discretion (*People v. Caffey*, 205 Ill. 2d 52, 89 (2001)), defendant argues

that *de novo* review applies here because the trial court's misapprehension of the law frustrated its exercise of discretion (*People v. Williams*, 188 Ill. 2d 365, 369 (1999)).

¶ 39    We agree with the State.  Our supreme court has determined that "[t]he decision as to whether an expert scientific witness is qualified to testify in a subject area *** remains in the sound discretion of the trial court." *In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004); see also *People v. Loggins*, 2019 IL App (1st) 160482, ¶¶ 76-77 (abuse-of-discretion standard applied in determining whether witness's testimony based on his " 'training and experience' as a drug investigator," was properly admitted as lay testimony).  Accordingly, we will reverse the trial court's decision to allow Boone to testify to her medical diagnosis of Ramirez's injuries only if that ruling "is arbitrary, fanciful, unreasonable, or *** no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89.

¶ 40    In resolving whether the trial court erred in allowing Boone to give expert testimony, we first must determine whether Boone provided lay or expert testimony.  Illinois Rules of Evidence 701 and 702 (eff. Jan. 1, 2011) govern the resolution of that issue.

¶ 41    Rule 701 sets forth the foundational requirements for nonexpert or lay witness testimony. Ill. R. Evid. 701 (eff. Jan. 1, 2011); *Loggins*, 2019 IL App (1st) 160482, ¶ 79.  The rule provides:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) *not based on scientific, technical, or other specialized knowledge* within the scope of Rule 702."  (Emphasis added.)  Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 42    Rule 701 "simply restates 'the general requirement that a witness must have personal knowledge of the matter to testify to it.' " *Loggins*, 2019 IL App (1st) 160482, ¶ 79 (quoting *People v. Novak*, 163 Ill. 2d 93, 102-03 (1994), *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353 (2006)).

¶ 43    Rule 702 sets forth the foundational requirements for expert testimony. *Id.* ¶ 80.   It provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." (Emphasis added.)  Ill. R. Evid. 702 (eff. Jan. 1, 2011).

Rule 702 allows for expert testimony if the witness " 'has knowledge and experience beyond the average citizen that would assist the [trier of fact] in evaluating the evidence.' " *Loggins*, 2019 IL App (1st) 160482, ¶ 81 (quoting *Novak*, 163 Ill. 2d at 104).

¶ 44    Neither Rule 701 nor Rule 702, which are modeled after the comparable federal rules, distinguishes between lay and expert *witnesses*.  Fed. R. Evid. 701 advisory committee's note to 2000 amendment; *Loggins*, 2019 IL App (1st) 160482, ¶ 82.   Rather, these rules differentiate between lay and expert *testimony*.  *Loggins*, 2019 IL App (1st) 160482, ¶ 82.   Accordingly, a witness may provide both lay and expert testimony in the same case, and "an expert *may* base an opinion (as a lay witness *must*) on facts that the expert has personally observed."  (Emphases in original.) *Id.*

¶ 45    Medical providers "are especially likely to serve as such dual-capacity witnesses," *i.e.*, provide both lay and expert testimony while testifying.  *Id.* ¶ 83; *Ngo v. Standard Tools & Equipment Co.*, 197 F.R.D. 263, 266 (D. Md. 2000) (medical provider can be a hybrid witness,

providing both lay and expert testimony). "To count as lay opinions, [the testimony] must be based on [the medical provider's] personal observations of the underlying events, and [the testimony] cannot require [the medical provider] to draw on any specialized knowledge or expertise." *Loggins*, 2019 IL App (1st) 160482, ¶ 88. Put more simply, the lay testimony "must be opinions that anyone in the same position, not just a trained [medical provider], would be qualified to offer." *Id.* For medical providers, lay testimony "include[s] *** [the medical provider's] simplistic observations[,] such as a [patient's] gait, the presence of swelling or that a body part is warm to the touch." *Ngo*, 197 F.R.D at 267.

¶ 46  If the medical provider's opinion is based "in any way" on the medical provider's specialized knowledge, that testimony is expert testimony, and it must satisfy the foundational requirements of Rule 702. (Internal quotation marks omitted.) *Loggins*, 2019 IL App (1st) 160482, ¶ 89. Testimony based on interpreting the results of a CT scan is expert testimony. *Piano v. Davison*, 157 Ill. App. 3d 649, 675 (1987) (testimony interpreting CT scans and skull X-rays was expert testimony because it was "beyond the understanding of a layperson").

¶ 47  Here, even a cursory examination of Boone's testimony reveals that her medical diagnosis was based not only on her physical observations of and conversations with Ramirez, but also on her interpretation of the CT scan report, which required "scientific, technical, or other specialized knowledge" and, thus, was governed by Rule 702. See Ill. S. Ct. Rs. 701, 702 (eff. Jan. 1, 2011); see also *People v. Botsis*, 388 Ill. App. 3d 422, 443 (2009) (distinguishing between lay observations and medical diagnosis). Indeed, Boone admitted that her medical diagnosis was influenced more by the CT scan, which she regarded as conclusive.

¶ 48  Defendant agrees that Boone provided both lay and expert testimony. He does not object to Boone's testimony about the "significant swelling" and "bruising" around Ramirez's left eye,

as that was lay testimony. Rather, defendant takes issue with Boone's testimony that she initially suspected that Ramirez had a "[f]racture" or "internal bleeding" and that her ultimate diagnosis was based on her interpretation of the CT scan results. Defendant claims that such testimony was expert testimony and bore heavily upon a fact at issue (great bodily harm) because "only [Boone's] specialized medical knowledge would allow her to make a connection between her observations and her concerns."

¶ 49     This argument requires us to review how a party establishes that a witness is qualified under Rule 702 to give expert testimony. The party seeking to have an expert testify bears the burden of establishing the expert's qualifications to render an opinion. *People v. Park*, 72 Ill. 2d 203, 209 (1978). A witness is qualified to give expert testimony if "(1) the witness may be of assistance to the trier of fact; (2) the witness is qualified to give the testimony sought; and, (3) the testimony sought is supported by adequate facts, data, or opinions." *Ruffin ex rel. Sanders v. Boler*, 384 Ill. App. 3d 7, 18 (2008) (citing M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.1, at 610 (7th ed. 1999)). Defendant's challenge is restricted to the second prong. Notably, he does not take a position on whether Boone, *in fact*, had the necessary credentials and experience to provide expert testimony in the form of a medical diagnosis ("Boone might have been qualified to give Rule 702 expert testimony, or she might not.") His claim, rather, is that her testimony was improper because the State never formally proffered her as an expert and thus the trial court never made a preliminary determination that she was "qualified to give the testimony sought." *Id.* Before reaching this specific claim, we first explain that Boone was in fact qualified to testify to her medical diagnosis of Ramirez's injuries.

¶ 50     A witness is qualified to give expert testimony if, "because of [the witness's] skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration

than is an ordinary person." (Internal quotations omitted.) *People v. Davis*, 335 Ill. App. 3d 1, 17 (2002). "The qualified expert's opinion must be based on scientific theories that have gained general acceptance in his or her field." *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 50. However, "[s]pecialized formal training is unnecessary, and experience alone may qualify a person as an expert." *Davis*, 335 Ill. App. 3d at 17. The expert's "knowledge [must be] based on information of the type reasonably relied on by experts in the [witness's] field." *Id.* at 18. "The expert must offer the basis for his or her opinion using a reasoned analysis, or the testimony is rendered invalid." *Jackson*, 2017 IL App (1st) 142879, ¶ 50.

¶ 51 We hold that Boone was "qualified as an expert" under Rule 702. Boone testified about her educational background, including her master's degree in physician-assistant studies and the national and state exams she passed to become certified and licensed as a physician's assistant. She also testified about her employment as a physician's assistant in the emergency room at Vista, which entailed treating one or two trauma patients every 12-hour shift in the 8 months she worked at Vista before treating Ramirez. Boone stated that, in reaching her conclusion that Ramirez suffered from a left blowout fracture of the orbital bone and retroorbital hemorrhage, she not only examined Ramirez and inquired about her injuries but also interpreted the results of the CT scan, which she was trained to do. Although Boone technically worked under the direction of a physician, most often she treated patients without first receiving any input from a physician. Given that Boone's education, training, and current employment qualified her as an expert medical provider, the court did not err in admitting her testimony about her diagnosis of Ramirez's injuries. Indeed, the trial court found that "[t]he foundation has been laid to allow [Boone] to testify [as an expert]."

¶ 52    However, defendant—as noted—suggests that more was required.  He claims that the State was required to expressly ask the trial court to accept Boone as an expert and to obtain an express ruling from the trial court.  Although it is true that, "[b]efore rendering an expert opinion, a witness must be qualified as an expert by the court" (*O'Brien v. Meyer*, 196 Ill. App. 3d 457, 461 (1989)), we cannot conclude that this requirement entails an explicit request for and acceptance of the witness as an expert before he or she may give expert testimony.  The plain language of Rule 702, to which we must defer (see *Lambert v. Coonrod*, 2012 IL App (4th) 110518, ¶¶ 18, 25), does not contain such a requirement.  Moreover, our supreme court has determined that a witness may testify as an expert simply if the record establishes that the witness possessed the required experience and qualifications to afford the witness knowledge uncommon to a layperson.  See *Novak*, 163 Ill. 2d at 104.

¶ 53    In *Novak*, the State's theory at trial was that the defendant, a baseball coach, sexually assaulted the 10-year-old victim under the guise of improving the boy's baseball skills with conditioning exercises.  *Id.* at 97.  The defense's position was that the defendant applied only legitimate training methods.  *Id.* at 98-99.  At trial, the State called in rebuttal two witnesses to testify to the defendant's alleged training methods.  *Id.* at 99.  The defense objected that the witnesses were not experts in the field of athletic training.  *Id.*  The State responded that the witnesses "were not being called as experts, but as lay witnesses 'who have familiarity in the field of strength training and exercising.' "  *Id.*  After the State gave an offer of proof, the trial court allowed the witnesses to testify.  *Id.*  On appeal, the defendant argued that "he did not receive a fair trial because the trial judge *** erroneously allowed lay opinion witnesses to testify to matters beyond the scope of their personal knowledge."  *Id.* at 98.  Our supreme court disagreed, concluding that, while the witnesses should not have been allowed to testify as lay witnesses, they

were qualified to render expert opinions, even though the State never asked that the witnesses be declared experts. See *id.* at 104.

¶ 54    Similarly here, Boone offered an expert opinion even though the trial court never officially designated her as an expert. Under *Novak*, however, this was not error, because Boone was indeed qualified to testify as an expert. See *id.*

¶ 55    Defendant argues that it was error to consider Boone's expert testimony because "[he] was denied an opportunity to fully and properly *voir dire* Boone before she offered her expert testimony." However, defense counsel declined an opportunity to talk to Boone about her qualifications before she testified, an option he did not exercise, and the trial court repeatedly advised defendant that it would give counsel great leeway in cross-examining Boone about her qualifications. Although a more formal procedure whereby the State alerts the defendant of its intent to offer expert testimony may be preferred (see Ill. S. Ct. R. 412(a)(iv) (eff. Mar. 1, 2001)), we conclude that defendant was offered an adequate opportunity to question Bonne about her qualification for testifying to her medical diagnosis of Ramirez's condition. He alone bears responsibility for his failure to take advantage of that chance.

¶ 56    Defendant cites *Jackson* and *Loggins*, but in our view, *Jackson* is distinguishable, and *Loggins*' analysis is inconsistent with *Novak*.

¶ 57    In *Jackson*, the court held that the trial court erred in allowing two paramedics to testify for the State that, based on their observations, the defendant was not having a seizure during an incident with the police. *Jackson*, 2017 IL App (1st) 142879, ¶ 57. The paramedics testified about their training and experience as paramedics, and each claimed to have seen people having seizures. *Id.* at ¶¶ 52-53. However, only one of them claimed to have had training on how to identify a seizure, and he provided no detail on the amount or content of that training. *Id.* at ¶ 52. The court

concluded that the paramedics could testify to their observations of the defendant but were not qualified to render a medical opinion on whether the defendant was having a seizure. *Id.* ¶ 57.

¶ 58    Here, in contrast to *Jackson*, the evidence revealed that Boone was trained to treat and diagnose trauma patients like Ramirez.

¶ 59    In *Loggins*, the court held that, although a narcotics police officer had specialized training in narcotics, the trial court erred in admitting his testimony about objects commonly used as drug paraphernalia, because the State never tendered, and the court never accepted, the officer as an expert in drug distribution.  *Loggins*, 2019 IL App (1st) 160482, ¶¶ 12, 106.  Defendant cites *Loggins* in arguing: "[S]ince Boone was never tendered by the State, nor accepted by the trial court, as an expert in any relevant field, the admission of significant portions of her testimony as lay opinion was error."  However, *Loggins* went on to cite *Novak* as setting up a harmless error rule: "When testimony is improperly admitted as a lay opinion, the error is harmless if the witness was, in fact, qualified as an expert, and thus would have been accepted as an expert by the trial court if so tendered."  *Loggins*, 2019 IL App (1st) 160482, ¶ 110 (citing *Novak*, 163 Ill. 2d at 98-104).  In our view, *Loggins* should not have found error in the first instance.  In doing so, the court grafted onto Rule 702 a requirement that a party must expressly proffer, and the trial court must expressly accept, a witness as an expert before that witness can give expert testimony.  Again, Rule 702 requires only that the witness be "qualified as an expert."  Ill. R. Evid. 702 (eff. Jan. 1, 2011).  A witness's qualification to give expert testimony is an entirely separate matter from whether the trial court had found the witness qualified.

¶ 60    All of that said, we are in no way condoning the presentation of expert testimony without first laying a basis for a witness to provide such testimony.  It is neither difficult nor overly burdensome to require the party seeking to present expert testimony to ask the court to find the

witness qualified as an expert in a particular field. However, requiring a party to make a specific articulation of that request would improperly put form over substance in a case like this, where a physician's assistant was essentially asked to render an opinion on exactly what she was trained to do.

¶ 61    Relying on *People v. Cortez*, 361 Ill. App. 3d 456 (2005) and *People v. Blair*, 395 Ill. App. 3d 465 (2009), *vacated on other* grounds 239 Ill. 2d 558 (2011) (supervisory order), the State argues that, because treating physicians need not be disclosed as experts under Illinois Supreme Court Rule 412(a)(iv) (eff. Mar. 1, 2001), they need not be qualified as experts under the Illinois Rule of Evidence 702 (eff. Jan. 1, 2011). We disagree. Not only do *Blair* and *Cortez* concern a different issue—whether a treating physician must be *disclosed* as an expert—but neither *Blair* nor *Cortez* addresses Rule 702. In *Cortez*, the trial court, relying on the defendant's blood test results, found the defendant guilty of driving a vehicle with a blood-alcohol concentration of 0.08 or greater. *Cortez*, 361 Ill. App. 3d at 463. On appeal, the defendant argued that the trial court erred in allowing the treating physician, who was not disclosed as an expert under Rule 412(a)(iv), to testify about how, if at all, the use of alcohol swabs and the giving of fluids intravenously to the defendant affected the defendant's blood test results. *Id.* at 465. After quoting at length from *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 234-35 (1988), which discussed the difference between a retained medical expert and a treating physician for purposes of civil discovery Rule 220 (107 Ill. 2d Rule 220), we held that "[the treating physician's] testimony need not have been disclosed as expert testimony." *Cortez*, 361 Ill. App. 3d at 466. In reaching that conclusion, we noted that, if all treating physicians had to be disclosed as experts, treating physicians would be precluded from testifying as anything but experts. *Id.*

¶ 62    In *Blair*, the State called at trial a radiologist who, although disclosed before trial, was not disclosed as an expert witness pursuant to Rule 412(a)(iv). *Blair*, 395 Ill. App. 3d at 483. The defendant objected, arguing that the radiologist, who never examined the victim but merely read her X-rays and computerized axial tomography (CAT) scans, had to be disclosed as an expert witness. *Id.* at 483-84. On appeal, we again cited *Tyzystuck* at length and concluded that the radiologist, who was on call when X-rays and CAT scans of the victim were taken, was a treating physician, not an expert retained to testify at trial. *Id.* at 485-86. Thus, the radiologist did not need to be disclosed as an expert under Rule 412(a)(iv). *Id.* at 486.

¶ 63    Defendant here, unlike the defendants in *Cortez* and *Blair*, is not arguing that the State failed to comply with the disclosure requirements of Rule 412(a)(iv). Defendant's argument focuses on Rule 702, which was not at issue in *Cortez* or *Blair*. Because, as defendant points out in his reply brief, Rule 412 generally concerns the disclosure of *witnesses* while Rule 702 concerns the disclosure of *evidence*, we cannot conclude that the rule in *Cortez* and *Blair*—that a treating medical provider does not need to be disclosed under Rule 412(a)(iv)—applies to Boone's expert medical testimony under Rule 702. If it did, the result would be as unacceptable as the approach rejected in *Cortez* and *Blair*. See *Cortez*, Ill. App. 3d at 466 ("[The] defendant's position [that treating physicians must be disclosed as experts under Rule 412] would effectively preclude any treating physician from testifying as anything but an expert."); *Blair*, 395 Ill. App. 3d at 485 (noting that, in *Cortez*, "w[e] also rejected the defendant's claim as a practical matter, reasoning that were we to adopt his position [that treating physicians must be disclosed as experts under Rule 412(a)(iv)], all treating physicians would be required to testify as experts"). That is, all treating physicians could render expert testimony without first being qualified to do so.

¶ 64    For these reasons, we hold that the trial court did not err in allowing Boone to offer expert testimony in the form of her medical diagnosis of Ramirez's injuries.

¶ 65                    B. Reliance on Expert Testimony

¶ 66    Even if the court erred in admitting Boone's expert testimony without first declaring her an expert, the error was harmless. Where the trial court improperly admits evidence, the error will not support reversal if it was harmless beyond a reasonable doubt. See *People v. King*, 2020 IL 123926, ¶ 40; but see *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (distinguishing constitutional errors from evidentiary errors and noting that the latter class of errors is deemed harmless if there is no reasonable probability that the jury would have acquitted the defendant absent the error). There are three approaches to determining whether an error is harmless: "(1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative." *King*, 2020 IL 123926, ¶ 40. If any one of these approaches is satisfied, the defendant is not entitled to relief. See *id.*

¶ 67    Assuming there was error, we cannot say that it did not contribute to defendant's conviction, as the trial court expressly relied on Boone's testimony (in addition to Ramirez's testimony) in finding defendant guilty. Moreover, Boone's medical diagnosis was neither duplicative nor cumulative. However, we conclude that the error was harmless beyond a reasonable doubt because the other evidence in the case overwhelmingly supported defendant's conviction and, more to the point, a finding of great bodily harm.

¶ 68    The testimony of Ramirez and Officers Piton and Kirby, together with Boone's lay testimony, established the severity of Ramirez's injury and supported a finding that defendant inflicted great bodily harm. Ramirez initially testified that she was hit more than once but could

not remember how many more times she was hit. After defendant intimidated her in open court, she changed her story and claimed that she could not remember if she was hit more than once. However, she went on to testify that she was hit so hard in the face that she fell to the ground and blacked out. As a result of the attack, she was in severe pain, she bled from her nose and lip, her left eye swelled shut, and she vomited. At trial, Ramirez still had impaired vision in her left eye. Officer Piton encountered Ramirez on the street after the attack and uttered, "Whoa"—clearly shocked by Ramirez's injuries. He, like Ramirez, indicated that the injury to her left eye was severe. Officer Kirby, like Officer Piton, commented on the severity of Ramirez's injuries, noting that Ramirez's eye was so swollen he could not see her eyeball. According to Boone, Ramirez reported that defendant struck her several times in the face with his fist. Ramirez complained of severe pain, headaches, dizziness, and nausea, and Boone saw significant swelling around Ramirez's left eye.

¶ 69 Citing *In re Vuk R.*, 2013 IL App (1st) 132506, defendant argues that the evidence, excluding Boone's medical diagnosis, did not establish great bodily harm, as "a fair-minded juror could reasonably" have found only bodily harm, not great bodily harm. In *In re Vuk R.*, the court held that the State failed to prove great bodily harm beyond a reasonable doubt where the victim and his father testified in a summary fashion about the victim's injuries, saying that the victim had a broken nose, cheekbone, and eye socket. *Id.* ¶ 9. There was no evidence concerning the victim's pain and suffering, the treatment he received for the injuries, or how long he suffered from their effects. *Id.*

¶ 70 Here, unlike in *In re Vuk R.*, Ramirez testified in detail about her injury, including its infliction, severity, and effects, both temporary and persisting. The severity of her eye injury was confirmed by Officers Piton and Kirby and by Boone. In our view, given this evidence, a fair-

minded fact finder could have found great bodily harm, not just bodily harm. Indeed, as the State observes, this evidence was more than enough to establish great bodily harm beyond a reasonable doubt. See *People v. Matthews*, 126 Ill. App. 3d 710, 714-15 (1984) (trier of fact could find great bodily harm when victim suffered bruising after being struck three times by bat on head and arm, even though victim testified that she " 'only had a bruise on [her] head' ").

¶ 71                                    III. CONCLUSION

¶ 72    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 73    Affirmed.